IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

DONNA FARMER,

        Plaintiff,

vs.                                 No.  06cv1138 DJS

MICHAEL J. ASTRUE,[1]
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.


## MEMORANDUM OPINION

This matter is before the Court on Plaintiff's (Farmer's) Motion to Reverse or Remand Administrative Agency Decision **[Doc. No. 9]**, filed March 5, 2007, and fully briefed on May 3, 2007.  On July 16, 2004, the Commissioner of Social Security issued a final decision denying Farmer's claim for disability insurance benefits.  Farmer seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).  Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds that the motion to remand is not well taken and will be **DENIED**.

## I.  Factual and Procedural Background

Farmer, now sixty years old (D.O.B. October 19,1946), filed her application for disability insurance benefits on April 26, 2002 (Tr. 56), alleging disability since December 1997 (Tr. 600), due to bilateral knee impairments, a pinched nerve in her neck, a disc bulge involving her back,

---

[1] On February 1, 2007, Michael J. Astrue became the Commissioner of Social Security.  In accordance with Rule 25(d)(1) of the Federal Rules of Civil Procedure, Mr. Astrue is substituted for Jo Anne B. Barnhart as the defendant in this action.

diabetes mellitus, hypertension, and fallen arches.  Tr. 25.  Farmer's insured status for disability

insurance benefits expired on **December 31, 2001**.  Tr. 25.  Thus, Farmer must establish that she

was disabled on or before that date.  *See Henrie v. United States Dep't of Health & Human*

*Servs.*, 13 F.3d 359, 360 (10th Cir.1993).  Farmer has a General Educational Development

(GED) Diploma, one year of college, and past relevant work experience as a temporary

administrative worker, self-employed tax preparer and business consultant (Tr. 24), and a district

manager and franchise director (Tr. 86).  On July 16, 2004, the ALJ denied benefits, finding

Farmer was not disabled.  Tr. 20.  Farmer filed a Request for Review of the decision by the

Appeals Council.  On October 31, 2006, the Appeals Council denied Farmer's request for review

of the ALJ's decision.  Tr. 5.  Hence, the decision of the ALJ became the final decision of the

Commissioner for judicial review purposes.  Farmer seeks judicial review of the Commissioner's

final decision pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final

decision is supported by substantial evidence and whether he applied correct legal standards.

*Hamilton v. Secretary of Health and Human Servs.,* 961 F.2d 1495, 1497-98 (10th Cir. 1992).

Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395

(10th Cir. 1994).  "Evidence is not substantial if it is overwhelmed by other evidence in the record

or constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).

Moreover, "all of the ALJ's required findings must be supported by substantial evidence,"

*Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence

2

of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989).  "[I]n addition to discussing the evidence supporting her decision, the ALJ must discuss the uncontroverted evidence she chooses not to rely upon, as well as significantly probative evidence she rejects."  *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996). Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met.  *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

"'The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.'" *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007)(quoting *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).  The court "may not 'displace the agenc[y]'s choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'" *Id.* (quoting *Zolantski*, 372 F.3d at 1200).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity.  *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)).  The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications.

3

20 C.F.R. § 404.1520 (a-f).  The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled.  *Thompson*, 987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show she is not engaged in substantial gainful employment, she has an impairment or combination of impairments severe enough to limit her ability to do basic work activities, and her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20 C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience. *Id.*

In support of her motion to reverse, Farmer makes the following arguments: (1) the ALJ failed to perform the proper credibility analysis; (2) the ALJ erred in failing to consider all of her severe impairments and their combined effect; (3)  the ALJ erred in his residual functional capacity determination; and (4) the ALJ erred in finding she could perform her past relevant work as a temporary administrative worker.

**A.  Credibility Determination**

Credibility determinations are peculiarly the province of the finder of fact and will not be upset when supported by substantial evidence.  *Diaz v. Secretary of Health and Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990).  "Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."  *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1988).  However, the ALJ's credibility determination does not require a formalistic factor-by-factor recitation of the evidence.  *Qualls v. Apfel*, 206

F.3d 1368, 1372 (10th Cir. 2000).  The ALJ need only set forth the specific evidence he relies on in evaluating claimant's credibility.  *Id.*  The ALJ may also consider his personal observations of the claimant in his overall evaluation of the claimant's credibility.  *Id.*  "Because '[e]xaggerating symptoms or falsifying information for purposes of obtaining government benefits is not a matter taken lightly by this Court,' [the Court] generally treat[s] credibility determinations made by an ALJ as binding upon review." *Talley v. Sullivan*, 908 F.2d 585,587 (10th Cir. 1990)(quoting *Gossett v. Bowen*, 862 F.2d 802, 807 (10th Cir. 1988).

In his decision, the ALJ found Farmer not credible and linked his finding to substantial evidence.  The ALJ noted, in part:

> The  claimant also alleged disability due to diabetes mellitus, Type II (Ex. 2E).  The medical record shows that Dr. M. Mrocheck diagnosed a history of diabetes mellitus in November 2001.  He did not state that the claimant had any symptoms or functional limitations associated with this medical condition (Ex. 10F).  In December 2001, a different doctor reported that the claimant's diabetes was "controlled by diet" since 1998 (Ex. 11F, pp. 8-11).  As of January 2003, the claimant had been prescribed Glucophage, an oral medication for her diabetes (Ex. 16F, p. 9).  However, she did not require insulin for her diabetes.  In fact, the claimant has a history of dieting to lose weight.  Apparently, this diet helped to control her diabetes.  Furthermore, as of December 3, 2001, the claimant had lost 30 pounds and she wanted to lose even more weight.  She admitted that she had been walking four to six blocks despite her diabetes (Ex. 11F).

> At the hearing, the claimant testified that she has been taking medications for diabetes since 1999 because her diabetes was not under control with diet.  <u>She added that she had confusion, dizziness and fatigue before she was prescribed medication (See, testimony).</u>  <u>However, this testimony is not supported by the underlying medical record and therefore, is not credible.</u>  Based upon the objective medical record, I find that there was no continuous 12-month period during which the claimant's diabetes did not respond to either diet or oral medication.  And, I further find that the claimant's diabetes did not cause any significant functional limitations.  Hence, I further find that the claimant's diabetes mellitus did not meet the criteria for a "severe" impairment as that term is defined in the Regulations.

** ** ** ** ** **

5

The claimant alleged disability due to back pain.  Specifically, she stated that she had a disc bulge of her lumbar spine (Ex. 2E).  There is only one notation which indicates that the claimant had a "HNP" (or, a herniated nucleus pulposus) of her lumbar spine (Ex. 11F, p.11).  There are no physical examinations, diagnostic tests, etc., which confirm this diagnosis.  Moreover, there is no indication that the claimant required treatment for this abnormality.  I note that Dr. Sweetser treated the claimant only for her bilateral knee impairments.  He neither diagnosed nor treated his patient for any back problems (Ex. 13F).  Hence, I do not find that the claimant was diagnosed with a "severe" back impairment in any of the pertinent exhibits of record.  Therefore, I find that the claimant did not have a "severe" impairment of her lumbar spine during the time period under review.

** ** ** ** **

At the hearing, the claimant testified that she has osteoarthritis in her hands and that her hands become swollen.  She also stated that she cannot use a keyboard or write more than 15 minutes as her hands "cramp" (See, testimony).  However, the medical evidence does not show that she has had any limitations of function associated with her upper extremities.  In fact, Dr. Sweetser's work assessment shows that she was able to lift up to 10 pounds frequently; she could carry up to five pounds frequently; she could use her hands for simple grasping and fine manipulation frequently; and she could reach frequently (Ex. 13F).  Thus, the medical evidence does not show that the claimant had a severe hand impairment in this case.

** ** ** ** **

At the hearing, the claimant testified that her "main problem" was "bad" knees.  She testified that she is able to sit for 30 minutes and then she must change position; she can stand for 30 minutes but she must lean on "something"; and she uses a cane "a lot" because she has fallen on a frequent basis. However, she admitted that she walks about 1 ½ a miles a day and that she is able to drive a car.

She also testified that she lies down three times per day for one to two hours due to the effects of fatigue and pain (See, testimony).  However, this testimony is not credible inasmuch as it is not supported by the underlying medical record.

After reviewing the claimant's testimony and other medical exhibits, I find that the claimant had a fairly active lifestyle prior to and after December 31, 2002, her date last insured.  She testified that she is able to live by herself (See testimony).  Thus, she is able to care for her personal hygiene and perform certain necessary household chores (Ex. 4E, p.17).  Also, the claimant has cooked meals with the use of a microwave.  In August 2002, she reported that she reads novels, cooks meals, attends church and sings in the church choir (Ex. 4E).  She also uses a computer, and she uses the "internet" for dating purposes (Ex. 4E, p.16).

6

Tr. 26-30 (emphasis added).  It is clear from the ALJ's decision that he discounted the significance of Farmer's subjective complaints of disabling conditions because of a lack of objective corroborative evidence which is appropriate.  *See Diaz,* 898 F.2d at 777.  Accordingly, the Court will not disturb the ALJ's credibility finding.

## B.  Step Two of the Sequential Evaluation Process

At step two of the sequential evaluation process, the claimant bears the burden to demonstrate that she has a medically severe impairment or combination of impairments that significantly limits her ability to do basic work activities.  20 C.F.R. § 404.1520(c)*; see also, Bowen v. Yuckert*, 482 U.S. 137, 146 & n.5 (1987); *Eden v. Barnhart*, 109 Fed.Appx. 311 (10th Cir. Sept. 15, 2004).  Basic work activities are "abilities and aptitudes necessary to do most jobs," and include the ability to understand, remember, and carry out simple instructions; to use judgment; to respond appropriately to supervisors, co-workers, and usual work situations; and to deal with changes in a routine work setting.  20 C.F.R. § 404.1521(b)(3)-(6).

The step two severity determination "is based on medical factors alone, and . . . does not include consideration of such vocational factors as age, education, and work experience." *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cr. 1988); 20 C.F.R. § 404.1520(c).  Although step two requires only a "de minimis" showing, the mere presence of a condition or ailment documented in the record is not sufficient to prove that the plaintiff is significantly limited in the ability to do basic work activities, *see Hinkle v. Apfel*, 132 F.3d 1349, 1352 (10th Cir.1997); *see also Williamson v. Barnhart*, 350 F.3d 1097, 1100 (10th Cir. 2003)("[T]he mere presence of a condition is not sufficient to make a step-two showing.").   To meet her burden, Farmer must

furnish medical and other evidence to support her claim.  *Bowen v. Yuckert*, 482 U.S. at 146 &
n.5.

Farmer contends the ALJ erred, at step two of the sequential evaluation process, when he
found her diabetes, fallen arches, back pain, neck pain, depression, and osteoarthritis in her hands
were not severe.  Tr. 26-28.

## 1.  Depression

Farmer argues

> She testified that she has had symptoms of depression since 1995 or 1996 and is taking
> medication for depression (Tr. 617).  She testified that she has problems with concentrating,
> focusing, and remembering, and that she becomes confused and has difficulty finishing what
> she starts (Tr. 619).  She related to the ALJ that she suffers from fatigue and must lie down
> typically two to three times a day for 1 to 1 ½ hours at a time (Tr. 616).

Pl.'s Mem. in Support of Mot. to Remand at 12.  Other than to refer to her testimony at the
administrative hearing, Farmer does not cite to the record to support her allegations.  A claimant's
statements alone are insufficient to establish the existence of a physical or mental impairment.  *See*
20 C.F.R.  §404.1528(a).

The Court has carefully reviewed the record (consisting of 622 pages) and finds that
substantial evidence supports the ALJ's finding that Farmer's depression did not have a significant
effect on her ability to work.  There is evidence in the record that Farmer has been treated for
depression; Farmer also testified she had a long history of depression, specifically, since 1995 or
1996.  Tr. 617.  However, the record does not support Farmer's contention that her depression
affected her concentration, focus, memory, or her ability to complete tasks.

In fact, the only mention of depression in 1995 was on January 20, 1995, when Lois A.
Toevs, M.D., mentioned a "strong family history of depression."  Tr. 560.  On February 14, 1995,

under medical problems, it was noted Farmer had a family hx of depression."  Tr. 563.  In 1996,

there is no mention of depression.  Tr. 537-541.  In 1998, there is no mention of depression;

however,  Farmer was in counseling along with her spouse due to "marital discord."  Tr. 464-465.


It was not until **April 20, 1999**, that Aparimita Gupta, M.D., prescribed Paxil 10 mg a day

for "problems she is having with her husband."  Tr. 445.  On **May 4, 1999**, Farmer reported she

"cried once a day because of perceived infidelity on husband's part."  Tr. 442.  Dr. Gupta

assessed Farmer with situational depression and increased the Paxil to 20 mg. a day.  *Id.*  On

**May 19, 1999**, Dr. Gupta evaluated Farmer and opined her situational depression and stress were

"controlled with Paxil at present."  Tr. 440.  On **August 19, 1999**, Farmer reported to Dr. Gupta

that she was doing well.  Tr. 436.  On that day, Dr. Gupta again noted Farmer's depression and

stress were "controlled with Paxil."  Tr. 437.

On **March 16, 2000**, Farmer reported to Dr. Gupta she was having some problems in her

social life and was in a relationship with a man that was causing her some problems.  Tr. 433.  Dr.

Gupta advised Farmer to continue taking the Paxil.  On **June 12, 2000**, Farmer reported to the

health care provider at Aspen Medical Care that she felt "very fatigued today" because she had

"been working 14-16 hr days, 7days/wk X 1 month."  Tr. 426.  Thus, at this time Farmer's

"depression" was not interfering her ability to work 14-16 hour days, 7 days a week.  On

**July 17, 2000**, Farmer returned to Aspen Medical Care.  Tr. 425.  "Depression" was not listed

under her medical history.

On **May 9, 2001**, Farmer reported she was trying "to wean off" Paxil.  Tr. 254.  By

**September 4, 2001**, Farmer was off Paxil.  Tr. 236 (list of "Present Medications").

On **August 6, 2002**, Farmer returned for an evaluation with Dr. Gupta.  Tr. 418-421.
Under "Current Medications," there is no mention of Paxil.  Tr. 418.  On that day, Farmer
reported she led a very active life and was in a new relationship and was "fairly happy about that."
Tr. 419.  Dr. Gupta assessed Farmer with Type 2 Diabetes, Hypothyroidism, and menopause.  Tr.
420.

By **July 17, 2003**, Farmer was not taking Paxil.  Tr. 528.  On that day Paxil was listed
under current medications as a PRN (as needed) drug.  *Id.*  However, a line had been drawn
through that notation, indicating Farmer was no longer taking Paxil even on an "as needed basis."

Farmer failed to demonstrate at step two that her depression significantly limited her
ability to engage in basic work activities.  Accordingly, the ALJ did not err in finding Farmer's
depression was not severe at step two.

**2.  Diabetes**

Farmer contends she testified "her diabetes was still not under control and that she still
had high blood sugars, causing confusion, dizziness, and fatigue and that the medication for her
diabetes causes swelling and water retention."  Pl.'s Mem. in Support of Mot. to Remand at 11.
Other than to cite to her testimony at the administrative hearing, Farmer failed to cite to the
medical record to support her claims.  Again, a claimant's statements alone are insufficient to
establish the existence of an impairment.  20 C.F.R.  §404.1528(a).

 On **November 2, 2001**, Farmer reported her diabetes was controlled by diet.  Tr. 309
("Type 2 diabetes essentially controlled by diet.").

On **December 3, 2001**, Farmer completed a "peripheral assessment" form and noted
"**Type II Diabetic– controlled by diet since – 98**."  Tr. 322.  On that same form, Farmer

10

reported she lived alone, traveled, walked 4-6 blocks/day, took golf lessons, and wanted to "go back to school." *Id.* The Court notes Farmer had to establish that she was disabled on or before **December 31, 2001** (Tr. 25), yet she reported no problems with her diabetes as of December 2001.

On **January 25, 2002**, Farmer saw Dr. Duerksen for a follow-up of her weight. Tr. 387. Farmer weighed 250 pounds on that day. Dr. Duerksen assessed Farmer with "Obesity" and noted "will try food diary, increase exercise as possible considering bilateral total knee replacements." *Id.*

**On February 7, 2002**, Farmer returned to see Dr. Duerksen to discuss her weight loss. Tr. 385. Farmer weighed 249 on that day. Farmer reported "BS am154/ 148/ 152/ 179/ 165/ 124/ 153/ 125/136." *Id.* However, Farmer had no complaints of fatigue, confusion, or dizziness.

On **February 19, 2002**, Farmer returned for a follow up with Dr. Duerksen. Tr. 384. Farmer complained she had been working on weight loss for several months without much success. Dr. Duerksen prescribed Phentermine, an appetite suppressant and referred Farmer to Donald Fry, M.D., for a gastric bypass evaluation. *Id.*

**On February 25, 2002**, Farmer returned to see Dr. Duerksen with complaints of dizziness from the Phentermine. Tr. 383. Farmer weighed 234 pounds on that day. Farmer also reported her blood sugar had been 168 that morning. Dr. Duerksen advised Farmer to discontinue the Phentermine or cut the dosage in half.

On **March 4, 2002**, Farmer returned for a follow up with Dr. Duerksen. Tr. 382. Farmer complained of upper respiratory symptoms and back pain.

11

**On May 14, 2002, Farmer went to Dr. Duerksen for a complete physical examination because she was applying for disability**.  Tr. 380.  Farmer weighed 231 pounds and was still taking Phentermine 30 mg.  On that day, Farmer requested a referral to an endocrinologist.  Dr. Duerksen referred Farmer to Aparimita Lahiri, M.D.

**On May 28, 2002**, Farmer saw Dr. Duerksen for a papsmear and pelvic examination.  Tr. 377.  Farmer had no complaints.  Dr. Duerksen ordered lab work.  **On May 29, 2002**, Farmer's fasting glucose level was 135 ( 65-109 is normal).  Tr. 379.  Farmer also had a Hemoglobin A1c (HbA1c) of 7.2.[2]  Tr. 378.

On **August 15, 2002**, Farmer went for a follow up with Dr. Duerksen to discuss her medications and glucometer (at-home blood sugar monitoring device).  Tr. 376.  Farmer was taking Glucophage for her diabetes.  Glucophage is indicated, along with diet and exercise, to improve glycemic control in patients with Type 2 diabetes.  *Physician's Desk Reference,* 833 (53rd ed. 1999).

On **August 29, 2002**, Dr. Duerksen or one of her assistants noted: **"T/C from pt letting us know that her BG (blood glucose) has been in the 80's on the Glucophage.  She is doing good."**  Tr. 376.

On **January 9, 2003**, Farmer returned to see Dr. Duerksen for a "medication check" and blood work.  Tr. 369.  **Farmer reported her fasting blood sugars were averaging 98-106 on**

---

[2] The HbA1c blood test, also called glycosylated hemoglobin, estimates how well blood sugar has been controlled during the previous three to four months.  Most physicians periodically determine glycosylated hemoglobin (Hb A1c).  In most laboratories, the normal Hb A1c is bout 6%; in poorly controlled diabetes, the level ranges from 9 to 12%.  *The Merck Manual* 170 (17th ed. 1999).

the glucophage which are within the normal range (65-109). *Id.* Farmer also reported experiencing fatigue. Dr. Duerksen noted "Need for sleep study? Depression? Thyroid?" At that time, Farmer was taking Paxil 10 mg "as needed." Thus, Dr. Duerksen did not consider her diabetes as the reason for the fatigue since Farmer's blood sugar levels were normal.

On **January 10, 2003**, Farmer reported to Dr. Duerksen that **she was doing "OK" on Glucophage**. Tr. 370.

On **February 4, 2003**, Dr. Lahiri completed a "Physician Questionnaire" and noted "diabetes, chol[esterol], thyroid should be controlled with medication." Tr. 325. On that form, under "**REMARKS ON ABOVE OR OTHER FUNCTIONAL LIMITATIONS**," Dr. Lahiri noted "**Unable to remark on**." *Id.* Dr. Lahiri did not list any limitations caused by Farmer's diabetes.

On **May 23, 2003**, Farmer called Dr. Lahiri's office. Tr. 401. Farmer informed Dr. Lahiri that her blood sugars were higher than the previous month and were around 140-145 for about one month. **Farmer also reported she was walking and eating well and had an appointment with a diabetic nutritionist on June 16th**. Dr. Lahiri directed Farmer to increase the Glucophage to 850 mg three times a day.

On **July 17, 2003**, Farmer reported to Dr. Duerksen that she was working with a dietician and had taken a diabetic cooking class. Tr. 367.

On **July 22, 2003**, Farmer's HbA1c was 6.5%. *Id.*

On **July 23, 2003**, Farmer returned for a follow up with Dr. Lahiri. Tr. 399-400. Dr. Lahiri noted Farmer had been "**doing fairly well**" and had "**weight had been stable**." Tr. 399. Dr. Lahiri noted Farmer's hemoglobin A1c was improved. Dr. Lahiri also noted "Type 2 diabetes

13

under better control."  Tr. 400.  Farmer refused a blood sugar test on that day.  Dr. Lahiri

recommended Farmer stop taking the Phentermine and the Glucophage and prescribed

Avandamet 1/500 instead, two in the morning and two in the evening for her diabetes.  *Id.*  Dr.

Lahiri directed Farmer to return in 3 to 6 months "depending on her convenience."  *Id.*

On **September 4, 2003**, Farmer called Dr. Lahiri's office requesting "standing orders" for

her blood work, i.e., HgA1c, lipid panel, and Comprehensive Metabolic Profile.  Tr. 396.  Farmer

offered no complaints.

Substantial evidence supports the ALJ's finding that Farmer's diabetes "did not meet the

criteria for a 'severe' impairment as that term is defined in the Regulations."  Tr. 26.  The record

shows Farmer's diabetes did not significantly limit her ability to do basic work activities during

the relevant time period.  As late as January 2003, Farmer reported doing well on Glucophage.

Although Farmer may have reported elevated blood sugar levels, the operative question for

disability benefits under the Act is whether Farmer experienced functional limitations due to her

diabetes.  *See Gardner-Renfro v. Apfel*, No. 00-6077, 2000 WL 1846220, at *3 (10th Cir. Dec.

18, 2000)(unpublished opinion).  On **February 4, 2003**, Dr. Lahiri completed a "Physician

Questionnaire" and did not list any limitations caused by Farmer's diabetes.  Tr. 325.  Thus, the

record does not support Farmer's claim that she experienced dizziness, confusion or fatigue due

to her diabetes during the relevant time period.

**3.  Back Pain, Neck Pain, Fallen Arches and Osteoarthritis in Hands**

The Court meticulously reviewed the record and found no mention of problems with fallen

arches or osteoarthritis of the hands at any of Farmer's multiple visits to multiple physicians.

Farmer relies on her testimony to support her claim that she is "significantly" limited as a result of

osteoarthritis of her hands.  However, her statements alone are insufficient to establish the

existence of an impairment.  *See* 20 C.F.R.  §404.1528(a).  As to her "fallen arches," Farmer

states this "**may** limit her ability to stand and walk."  Pl.'s Mem. in Support of Mot. to Remand at

12.  However, the record does not support this claim.

On August 27, 2001, x-rays of the cervical spine indicate "**mild** degenerative disease with

**mild** left sided C4-5 neural foraminal stenosis."  Tr. 244.  On September 4, 2001, Farmer

reported to Jacqueline Dean, M.D., a Board Certified Internist and Rheumatologist, that "her

neck makes a grinding sound and has decreased ROM (range of motion)."  Tr. 236.  Farmer did

not contend her neck caused her pain or limited her in any way.  Dr. Dean performed a physical

examination and noted "She has decreased ROM in the neck."  *Id.*  Dr. Dean assessed Farmer as

having "severe osteoarthritis of the knees, needs total knee replacement."  Tr. 237.  Dr. Dean did

not assess Farmer's neck condition as being a problem.

As to Farmer's back problem, on December 3, 2001, Farmer reported under "Spinal

history" that she had "Back Pain HNP– L4-L5."  Tr. 322; *see also* tr. 382.  However, there is no

medical evidence in the record to support this statement.  Accordingly, substantial evidence

supports the ALJ's determination that these impairments were not severe at step two of the

sequential evaluation process.

**C.  Combination of Impairments**

Farmer also argues the ALJ failed to "consider the combined effects of all her

impairments."  Pl.'s Mem. in Support of Mot. to Remand at 11.  The Court disagrees.  In his

decision, the ALJ noted:

15

> A medically determinable impairment or combination of impairments is "severe" if it significantly limits an individual's physical or mental ability to do basic work activities (20 C.F.R. §404.1520).   The Regulations require that if a "severe" impairment exists, <u>all medically determinable impairments must be considered in the remaining steps of the sequential analysis (20 C.F.R. §404.1523).</u>

Tr. 26 (emphasis added).   Generally, the Court "takes a lower tribunal at its word when it declares it has considered a matter." *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005).   The ALJ also noted in his decision:

> Furthermore, as stated herein, the claimant worked on a part-time basis as a tax preparer and a business consultant.   The claimant submitted documentation regarding this work activity, and she testified that she prepared tax returns during 2003 and 2004.   <u>I find that the claimant's ability to perform this work activity shows that she was able to perform basic work-related activities, such as sitting for vocationally-relevant time periods in addition to using her hands and fingers for both gross and fine manipulation and tasks involving bilateral manual dexterity.   Moreover, her ability to perform such work shows that she had no significant problem with attention, concentration, or memory.   Thus, I find that the severity of the claimant's fatigue, pain, or depression did not hinder her ability to perform work that was at least sedentary in exertional level and semiskilled in nature.</u>   The claimant also admitted that she goes to basketball games and takes week-end trips.
>
> Pursuant to prevailing Tenth Circuit caselaw, Section 404.1529 of the Regulations, and Social Security Ruling 96-7p, I find that there was no consecutive 12-month period during which the claimant lacked a residual functional capacity for a full range of light work prior to December 31, 2001, her date last insured.

Tr. 31 (emphasis added).   Accordingly, the ALJ makes clear that even though he did not find these to be severe impairments, he nonetheless considered all her impairments in his RFC determination.

## D.  RFC Determination

Residual functional capacity is defined as "the maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirement of jobs."   20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(c).   In arriving at an RFC, agency rulings require an ALJ to provide a "narrative discussion describing how the evidence supports" his or her

16

conclusion.  See SSR 96-8p, 1996 WL 374184, at *7.  The ALJ must "discuss the individual's

ability to perform sustained work activities in an ordinary work setting on a regular and

continuing basis . . . and describe the maximum amount of each work-related activity the

individual can perform based on the evidence available in the case record."  *Id.*  The ALJ must

also explain how "any material inconsistencies or ambiguities in the case record were considered

and resolved."  *Id.*  "The RFC assessment must include a discussion of why reported symptom-

related functional limitations and restrictions can or cannot reasonably be accepted as consistent

with the medical or other evidence."  *Id.*

   Farmer contends the ALJ's RFC finding is not supported by substantial evidence.  Farmer

claims the ALJ erred in his RFC finding because he relied on the State agency physician's  RFC

assessment; Farmer asserts "[f]indings of State Agency physicians are not substantial evidence."

Pl.'s Mem. in Support of Mot. to Remand at 16.  In his decision, the ALJ found:

> Therefore, I must determine whether the claimant retains the residual functional capacity to perform her past relevant work or whether she can adjust to other work existing in significant numbers in the national economy.  The term "residual functional capacity" is defined in the Regulations as the most an individual can still do after considering the effects of physical and/or mental limitations that affect the ability to perform work-related tasks (20 C.F.R. §404.1545 and Social Security Ruling 96-8p).
>
> In making this assessment, I must consider all symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements of 20 C.F.R. §404.1529, and Social Security Ruling 96-7p.  I must also consider any medical opinions, which are statements from acceptable medical sources, which reflect judgments about the nature and severity of the impairments and resulting limitations (20 C.F.R. §404.1527 and Social Security Rulings 96-2p and 96-6p).
>
> The medical record establishes that the claimant has a long history of bilateral knee impairments (Ex. 1F-5F).  Dr. David Manning, treating doctor, reported that the claimant had "progressive" degenerative arthritis of her left knee which was identified on a 1995 arthroscopy (Ex. 5F, p.23).  In June 2000, Dr. Manning reported that the claimant continued to have symptomatic degenerative arthritis of her left knee (Ex. 7F, p.7).  And, in September

2001, Dr. J. Dean diagnosed "severe" osteoarthritis of the claimant's knees, adding that she required a total left knee replacement (Ex. 7F, p.2).

On October 29, 2001, Dr. Sweetser reported that his patient had "severe" osteoarthritis in both of her knees which did not respond to conservative medical treatment. On that date, the claimant underwent bilateral total knee replacement with no complications. According to Dr. Sweetser, the claimant was to go to a rehabilitation center. He stated that her condition on discharge from the hospital was "satisfactory and improved" (Exh. 9F, 13F, and 27F).

The claimant sought treatment at the rehabilitation center from November 2, 2001, to November 9, 2001. On November 19, 2001, a case manager at the center wrote Dr. Sweetser a letter stating that the claimant had been discharged from the center on November 19, 2001 (Ex. 10F). Although the claimant attended physical therapy after November 2001, there is adequate evidence that the claimant had a favorable recovery from her surgery consisting of bilateral total knee replacements (Ex. 10F and 13F). I further find that this surgery did not result in any significant limitations of function as of December 31, 2001, when the claimant last met ht insured status requirements for disability benefits.

Also, subsequent treatment records show that the claimant recovered from her October 2001 surgery. In November 2001, she informed Dr. Sweetser that she had made "excellent progress" while at the rehabilitation center concerning her ambulation and range of knee motion. She continued to walk with a walker and had not fallen. Dr. Sweetser reviewed the x-rays which showed there were "no signs of any problems." And, his clinical evaluation showed that she had some swelling with "stable" knees (Ex. 13F, p.10).

In December 2001, the claimant told Dr. Sweetser that she was "slightly frustrated" with her progress. However, Dr. Sweetser noted that she was "not particularly restricted" in her daily living activities. He also reported that she had "excellent" range of knee motion with "excellent" strength. There was no instability noted on examination and "very little" crepitus. Also, Dr. Sweetser reported that there were no "unusual" areas of tenderness. And, her quadriceps and hamstring contractions were "excellent." He encouraged his patient to continue to exercise on a "regular basis." Dr. Sweetser added that: "She may dance if she so desires." And, she could drive from Las Cruces, New Mexico, to Las Vegas, Nevada, in [approximately] one week (Ex. 13F, p. 9).

Obviously, Dr. Sweetser thought that his patient had made an excellent recovery from her surgery in October 2001. Moreover, he did not place any restriction on her ability to perform rather strenuous activities, such as dancing, driving for long distances, and exercising. Thus, I find that the claimant's surgery did not result in any significant functional limitations as of December 31, 2001, her date last insured.

As of January 2001, Dr. Sweetser reported that the claimant was "doing well" overall after 17 sessions of physical therapy. She was walking "more effectively" and had "definitely" improved her strength. She was walking without any assistive devices. A physical examination showed that the claimant had almost full extension in both knees and only "mild" swelling. He concluded that his patient was making "good progress in her recovery." He referred her for only one physical therapy session during the next four weeks (Ex. 13F, p. 8).

In April 2002, the claimant told Dr. Sweester that she had fallen in March 2002, injuring both knees.  However, x-rays of her knees were normal, and he diagnosed only a contusion (or, a bruise), of her knees.  He told his patient that he had found "no evidence of a serious injury, adding that she should stay "active" (Ex. 13F, pp. 6-7).

There are no treatment notes from Dr. Sweester for the period from April 2002 to March 2003.  On March 21, 2003, he prepared a work assessment form.  According to Dr. Sweetser, the claimant could only sit for two hours during a regular eight-hour work day and she could stand and/or stand (sic) for less than one hour during a work day.  He also stated that she could lift up to 10 pounds frequently and 20 pounds occasionally.  And, he added that she could carry up to five pounds frequently.  In addition, Dr. Sweetser opined that she could use her hands for simple grasping and fine manipulation on a frequent basis and she could bend occasionally and reach frequently.  She could not squat, crawl, or climb.  Dr. Sweetser concluded that his patient's condition had been at this "severity" for five years or more (Ex. 13F, pp. 1-3).

However, as noted above, the medical evidence is clear that Dr. Sweetser had not examined his patient for a period of several months.  Hence, there are no underlying medical reports, diagnostic test, etc., which support Dr. Sweetser's work limitations.  The most recent medical records from Dr. Sweetser show that the claimant was doing very well with her standing, walking, etc.  Also, rather than completing a narrative report to substantiate his findings, Dr. Sweetser merely checked boxes on a form (Ex. 13F, pp. 1-3).  Based on this evidence, I find that Dr. Sweetser's work assessment form was brief, conclusory and unsupported by the objective medical evidence.  Thus, I do not give Dr. Sweetser's medical opinions significant weight.  Instead, I find that orthopedic follow up through April 2002 shows reasonable recovery from surgery.

I note that, as of June 2003, a state agency doctor had reviewed the medical evidence to date.  This doctor determined that the claimant had a residual functional capacity for a full range of light work as defined in the Regulations (Ex. 15F).  I concur with this doctor's medical findings.

Tr. 28-30.  It is clear from the ALJ's discussion regarding Farmer's RFC that he considered all the

evidence in determining that Farmer retained the RFC to perform a full range of light work, not

just the State Agency physician's June 2, 2003 Physical Residual Functional Capacity Assessment

(Tr. 354-361).

The ALJ also considered Dr. Sweetser's April 2, 2003 RFC assessment.  Generally, the

ALJ must "give controlling weight to a treating physician's well-supported opinion, so long as it

is not inconsistent with other substantial evidence in the record."  *Drapeau v. Massanari*, 255

F.3d 1211, 1213 (10th Cir. 2001).  A treating physician's opinion is considered in relation to factors such as its consistency with other evidence, the length and nature of the treatment relationship, the frequency of examination, and the extent to which the opinion is supported by objective medical evidence.  20 C.F.R. § 404.1527(d) (1)-(6).  If the physician's opinion is "brief, conclusory and unsupported by medical evidence," that opinion may be rejected.  *Bernal v. Bowen*, 851 F.2d 297, 301 (10th Cir. 1988).  Moreover, a treating physician's opinion that a claimant is totally disabled is not dispositive "because final responsibility for determining the ultimate issue of disability is reserved to the [Commissioner]."  *Castellano v. Secretary of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994).

In this case, the ALJ set forth specific, legitimate reasons for disregarding Dr. Sweetser's opinion.  *Drapeau*, 255 F.3d at 1213 ("When an ALJ decides to disregard a medical report by a claimant's physician, he must set forth specific, legitimate reasons for his decision.").  Substantial evidence supports the ALJ's finding that Dr. Sweetser's RFC assessment and the restrictions he outlined therein were not supported by the objective medical record or his medical notes.  On **December 18, 2001**, Dr. Sweetser examined Farmer and noted:

> Patient is now six weeks post bilateral total knee replacement.  **She reports that she is slightly frustrated at her slow progress, but when asked what she is doing, <u>she is not particularly restricted.</u>**  She completed her course of physical therapy thus far and has regained almost 118 degrees of flexion of the right knee and 114 degrees of flexion of the left knee.  **This is done with excellent strength**.
>
> She continues to go to therapy.
>
> **EXAMINATION:** Exam today confirms the findings as noted above.  **<u>Her range of motion is excellent.  There is no instability and very little crepitus.  No increased heat of any significance and no unusual areas of tenderness are present either.  Quadriceps and hamstring contractions are excellent.  Her range of motion is noted.</u>**

> **TREATMENT: <u>Patient is encouraged to continue to exercise on a regular basis.  She may dance if she so desires.  She may also drive to Las Vegas in approximately one week.</u>**  She is also desirous of starting a weight watchers program and I informed her that this would be good for her, especially if she could lose a significant amount of weight.  I will see her for re-check in approximately one month.

Tr. 334 (emphasis added).  On **January 24, 2002**, Dr. Sweetser noted "not able to lose weight with diet.  May need a Gastric Stapling.  I support this for her."  *Id.*  There is no mention of Farmer's condition changing.  Thus, Dr. Sweester's medical notes and the objective medical evidence does not support his April 2, 2003 RFC assessment.

Farmer also contends that the ALJ gave more weight to the State agency physician's opinions than her treating physician even though he is considered a nonexamining source.  Under the regulations, State agency expert opinions "must be treated as expert opinion evidence of a nonexamining source."  *See* SSR 96-6p, 1996 WL 374180, at *1.  Like opinions by nontreating sources, the ALJ "may not ignore these opinions and must explain the weight given to these opinions in their decisions."  *Id.*  However, "the opinions of State agency medical and psychological consultants . . . can be given weight only insofar as they are supported by evidence in the case record . . . ."  *Id.* at *2.  Notably, "[i]n appropriate circumstances, opinions from State agency medical and psychological consultants . . . may be entitled to greater weight than the opinions of treating or examining sources."  *Id.* at  *3.  This may occur where the state agency consultant's opinion "is based on a review of a complete case record that includes a medical report from a specialist in the individual's particular impairment which provides more detailed and comprehensive information than what was available to the individual's treating source."  *Id.*

The ALJ gave the proper weight to the State agency consultant's opinion.  The State agency consultant reviewed the record and opined Farmer retained the RFC for a full range of light work.[3]  In support of this opinion, the State agency physician noted:

> The claimant is a 56 year old lady with a Title II claim with an AOD of 1997 (vague) and DLI of 12/01.  She has a long history of knee problems.  On 12/8/95 she had a right knee arthroscopy for a medial meniscal tear and chondroplasty for grade II-III chondromalacia.  She was followed by many years by Dr. Manning.  She had a left knee arthroscopy 4/95 with grade III-IV chondromalacia and a degenerative tear in the medial meniscus.  In 1999 she had 5 hyalgan injections in the left knee for arthritis.  She had also lost 44 pounds.  She was then seen 6/30/00 with increasing left knee pain.  A knee replacement was planned but never took place due to the fire in Los Alamos.  There was no further follow-up with Dr. Manning. The claimant had a rheumatology evaluation with Dr. Dean 9/4/01.  Problem list included DM, HTN, and multiple minor surgeries in addition to her knee surgeries.  She had just returned from a 7 week vacation where she toured in her van.
>
> The claimant established with orthopedist Dr. Sweetser 10/2/01 with advanced OA of both knees.  On 10/29/01 she underwent bilateral total knee replacements.  Orthopedic follow-up through 4/23/02 shows reasonable recovery from her surgery.

Tr. 355-356.  The record supports the State agency physician's findings.  Accordingly, substantial evidence supports the ALJ's RFC determination.

At step four of the sequential evaluation process, the ALJ found "the evidence . . . establishes that the claimant has past relevant work as a temporary administrative worker," and "the claimant described this work as light in exertional level."  Tr. 31.  The ALJ concluded, "Based upon the residual functional capacity, I find the claimant could have returned to her past

---

[3] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, [she] must have the ability to do substantially all of these activities.  20 C.F.R. § 404.1567(b).

relevant work as a temporary administrative worker prior to December 31, 2001, her date last insured" . . . "as performed by her."[4]  *Id.*  Substantial evidence supports this finding.

Relying on "findings of Dr. Sweetser," Farmer contends she can "walk less than one hour per day" thus she is "unable to perform light work."  Pl.'s Mem. in Support of Mot. for Remand at 19.  However, the ALJ properly disregarded Dr. Sweetser's RFC assessment.  Farmer also contends she cannot perform her past relevant work because of mental confusion, extreme fatigue requiring rest breaks throughout the day, and osteoarthritis of her hands that precludes use of her hands on a repetitive basis.  *Id.*  Farmer relies on her testimony to support her claim that "[a]t best, she can perform sedentary work four hours per day with frequent breaks at a low level job not requiring high mental capacity, sustained attention, or repetitive hand usage."  *Id.*  However, the ALJ did not find Farmer credible and discounted these allegations because the objective medical evidence did not support her allegations.  Accordingly, the ALJ's finding that Farmer "could have returned to her past relevant work as a temporary administrative worker prior to **December 31, 2001**, her date last insured," as "performed by her," is support by substantial evidence.

---

[4] Farmer described her job of temporary administrative worker as "**varied** with assignment or temp[orary] position: keyboarding, analyzing financial reports & data, legal research, computer maintenance & trouble shooting, meetings, secretarial, ans[wering] phones, give tours, etc., some travel."  Tr. 87.  Farmer also reported she walked a total of 1 hour, stood 1 to1 ½ hours, sat for 3 hours, and would "write, type, or handle small objects for 5 hour.  *Id.*  Farmer reported the **heaviest** weight she lifted varied depending on the job assignment and could be as much as 50, 75, or 100 lbs.  *Id.*  Farmer reported the weight **frequently** lifted as 35 lbs.  *Id.* Farmer failed to indicate on the form how often she lifted these amounts or how far she had to carry them as requested in the form.

**E.  Conclusion**

      The Court's role is to review the record to ensure that the ALJ's decision is supported by substantial evidence and that the law has been properly applied.  After such review, the Court is satisfied that substantial evidence supports the ALJ's credibility and RFC determination and his finding of nondisability.  Accordingly, the ALJ's decision is affirmed.

      A judgment is accordance with this Memorandum Opinion will be entered.

_____
**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**